We will hear argument first this morning in case number 19-431 Little Sisters of the Poor versus Pennsylvania and the consolidated case. General Francisco. Mr. Chief Justice and may it please the court. In 2011 the government required employers to provide insurance coverage for all FDA-approved contraception, including many religious employers who objected to the coverage, sparking years of litigation. In 2017, in the best traditions of this country's commitment to religious liberty, the government sought to resolve the issue by promulgating new rules exempting those employers who objected to the mandate. Those exemptions are lawful for two reasons. First, they're authorized by section 13-A-4 of the ACA, which requires employers to provide for and support. So it authorizes the agencies to require most employers to provide contraceptive coverage while exempting the small number of employers who have sincere conscientious objections. But it doesn't create an all or nothing choice, require coverage for everyone or no one. Otherwise, the long-standing church exemption, the effective exemption for self-insured church plans and indeed respondents' understanding of the accommodation itself would also violate the statute since the employer's group health plans don't provide the mandated coverage. Second, RFRA at the very least authorizes the religious exemption. It prohibits the government from imposing a substantial burden on religious beliefs subject to a discretionary exception. It may substantially burden religious beliefs if it can satisfy strict scrutiny, but RFRA doesn't require the government to do that. Otherwise, the government would have to divine the stingiest accommodation that a court would uphold, virtually guaranteeing a loss in every case. Neither RFRA nor the ACA requires that result. I'd like to begin with the section 13-A-4 issue, which requires employers to provide whatever coverage HRSA provides for and supports. Before you get to that, I'd like to ask you a question on your RFRA point. I wonder why it doesn't sweep too broadly. It is designed to address the concerns about self-certification and what the Little Sisters call the hijacking of their plan, but the RFRA exemption reaches far beyond that. In other words, not everybody who seeks the protection from coverage has those same objections. So I wonder if your reliance on RFRA is too broad. I don't think so, Your Honor, for a couple of different reasons. First, RFRA itself and its operative language prohibits the government from imposing a substantial burden subject to a single exception. And when you look at that exception, what it says is that the government may impose that burden if it thinks it can satisfy strict scrutiny. So once there's a substantial burden, the government has the flexibility to lift it in different ways, including through a traditional exemption. Otherwise, this court's decision in making a whole lot of sense, because there the court ordered the government to consider further modifying the accommodation, even assuming the accommodation fully satisfied RFRA. That doesn't make sense if RFRA prohibits anything that it doesn't affirmatively require. Thank you, counsel. Justice Thomas? Justice Thomas? Well, we'll come back to Justice Thomas. Justice Ginsburg? The glaring feature of what the government has done in expanding this exemption is to thrust to the wind entirely Congress' instruction that women need and shall have seamless, no-cost, comprehensive coverage. Seamless, no-cost, comprehensive coverage. This leads to women to hunt for other government programs that might cover them. And for those who are not covered, they have to pay out of their own pocket, which is exactly what Congress didn't want to happen. And in this area of religious freedom, the major trend has not to give everything to one side and nothing to the other side. We have had a history of respect for the employer's workers and students who do not share the employer's or the university's objections to contraceptives. And every time we have dealt with this subject, we have assumed that there would be a way to provide coverage that would not involve any cost sharing by the individual. So in Hobby Lobby, we assumed that the self-certification was okay because women could receive coverage without any cost sharing by the organization, the group health plan, or the participant. And then in Wheaton, we said nothing in the interim rules affects the ability of applicants, employees, and students to obtain without cost the full range of FDA-approved contraceptives. And finally, in Zubik, we said we instructed the party to endeavor to put in place an accommodation of the employer's religious exercise while at the same time ensuring women covered by employer's health plans, ensuring that women receive full and equal health coverage, including contraceptive coverage. You have just tossed entirely to the wind what Congress thought was essential, that is that women be provided these services with no hassle, no cost to them. Instead, you are shifting the employer's religious beliefs, cost of that, onto these employees who do not share those religious beliefs. And I did not understand RIFRA to authorize harm to other people, which is evident here, that the women end up getting nothing. They are required to do just what Congress didn't want. General Francisco, could you respond? Yes. Respectfully, Your Honor, I think I would disagree with the premise of your question because there's nothing in the ACA, as this court recognized in Hobby Lobby, that requires contraceptive coverage. Rather, it delegated to the agencies the discretion to decide whether or not to cover it in the first place, and we think that that also includes the discretion to require that most employers provide it, but not the small number who have sincere, conscientious objections, because otherwise, the original church exemption likewise would be illegal, as would the effective exemption for self-insured church plans. The church itself has enjoyed, traditionally, an exception from the very first case, the McClure case in the Fifth Circuit. The church itself is different from these organizations that employ a lot of people who do not share the employer's faith. And I thought that Congress had delegated to HRSA for its expertise in what contraceptive coverage women would need. Briefly, General Francisco? Yes, Your Honor. Respectfully, the church exemption and the effective exemption for self-insured church plans speak much more broadly. They encompass not just churches and their integrated auxiliaries, but elementary schools, high schools, colleges, universities, charitable organizations, hospitals, and other healthcare organizations. So, I don't think that they're authorized by the so-called ministerial exception. Rather, they're authorized by Section 13A4 and by RFRA. Thank you. Justice Thomas? Thank you, General Francisco. A quick question about HRSA's broad authority. You seem to, as you did in your last answer, suggest that ACRA has almost unlimited authority to both create guidelines and exceptions from those guidelines. First, if you would give us just an idea of what standards are to guide their discretion and the services that are provided, as well as the exemptions that are offered by the guidelines. Yes, Your Honor. I think there are three limitations that I would point to. First, because HRSA has the discretion not to require any contraceptive coverage at all, as this court acknowledged in Hobby Lobby. I think that that plainly encompasses the discretion to acquire recoverage by most employers, but not the small number with sincere conscientious objections. Secondly, it's further constrained by the APA's requirement for reasoned decision making, which prohibits arbitrary exemptions. And third, I think that the term preventive services in the statute itself potentially provides yet another limitation, since at the very least, that would encompass the types of things that governments traditionally take into account when regulating in this area, including the impact that their regulations would have on religious believers. And I point you to the Federal Register, 83 Federal Register at 58-598, where the government goes through and details the history of according conscientious objectors protections when regulating in these very sensitive medical areas. At what point do you run into a non-delegation problem? Your Honor, I don't think we have a non-delegation problem at all here for the reasons we've said. I think all of those would establish limiting principles, including the phrase preventive services, which at the very least would limit what the government can do to the types of things that traditionally it has done when regulating in this area. If I could just give you a quick hypothetical. Suppose the Congress delegated to the Department of Defense the authority to create a draft. I think that that would necessarily include the authority for the Department of Defense to craft conscientious objections to the draft, precisely because that's the type of thing that governments traditionally consider in that area. Likewise here, in regulating in sensitive medical areas, governments traditionally take into account the impact that their regulations have on conscientious objectors. Thank you, General. Justice Breyer? Morning. General, I had exactly the same question as Justice Thomas's first question about what are the standards that govern when the agency can make exceptions and how and what they must look like. If you have anything to add on that, do. If not, thank you very much. You can I would add is that I think all of these limitations would fully make sure that any time HRSA is exercising its discretion, it's doing so in a rational way. After all, this is the very same discretion that was used not just to adopt the church exemption, but also the effective exemption for self-insured church plans and under respondents' understanding of the accommodation, even the accommodation itself. In each one of those three instances, the employer's benefits plan is not providing the mandated coverage. And in two of them, nobody is providing the mandated coverage. And so if you concluded that the agency didn't have this discretion, that would undermine the validity of the church exemption, the effective exemption for self-insured church plans, and potentially the accommodation more other than medical need, can HRSA or could HRSA take into account in deciding which preventive services and the degree to which preventive services would have to be covered by an insurance plan? For example, could it take costs into account? Well, your honor, if it took costs into account, I think that the first question would be whether the manner in which it took costs into account satisfied the arbitrary and capricious standard. And I certainly do think that they could take costs into account in deciding what types of preventative services to require. If, for example, there was a particular type of preventative service that was a new technology that was actually quite helpful, but it was cost prohibitive for just about every employer or any insurance company to cover, I certainly think that HRSA could take that into account in deciding whether or not to require it pursuant to the guidelines issued under Section 13A4. This broad issue has been before this court on a number of prior occasions, and until this case, I hadn't seen the argument that the Affordable Care Act did not allow HRSA to make any exceptions based on conscientious objection. When did this argument first surface? To my knowledge, your honor, it first surfaced in this litigation, but if you look back to the promulgation of the original church exemption back on August 3, 2011, and you look at the Federal Register Notice, it makes crystal clear that the church exemption was based on Section 13A4. In describing Section 13A4, the government determined that it had the authority under 13A4 to promulgate the church exemption, and that's likewise the reason why the effective exemption that covers all self-insured church plans and the accommodation more generally is likewise lawful under 13A4. Under my friend's position on the other side, I think all of those things would violate 13A4. Thank you. Thank you, General. Justice Sotomayor? General, first of all, you keep calling it a small number of women who won't get coverage, but I understand the figure to be somewhere between 75,000 and 125,000 women, correct? Well, your honor, yes, that's the number that would be affected by the exemption as compared to the original church exemption and effective exemptions that affected around 30,000 women, but I would note that in this particular litigation, the respondents haven't yet identified anyone who would actually lose access to contraception as a result of these rules. I think presumably because access to contraception is widely available in this country through many other means besides... Let's go there. HHS decided that contraceptives were a preventive service required under the Act. Now you say it has to take care to both promulgate the Act and accommodate religious objections, but in your calculus, what you haven't considered or told me about is the effect on women who now have to go out, as Justice Ginsburg said, and search for contraceptive coverage if they can't personally afford it. I just wonder, if there is no substantial burden, how can the government justify an exemption that deprives those women of seamless coverage? So, your honor, two points. First of all, I think 13A4 is what provides them the discretion to do it, which is what they did in the effective exemption that covers self-insured church plans. That imposes no more or less of a burden than this exemption does, but putting that to the side, RFRA itself at section 2000BB-4 explicitly permits any exemption that doesn't violate the Establishment Clause. And here, I don't think there's any plausible argument that the exemptions violate the Establishment Clause under this court's decision in Amos, which upheld the Title VII exemption to religious employers, which after all authorized religious employers to fire an employee for religious reasons. And since it's permitted under RFRA, and it's permitted under section 13A4, I don't think any of these considerations undermine the validity of these exemptions. Next, Kagan. Thank you. Good morning, General. I'd like to go back to the Chief Justice's first question, which was about whether this rule sweeps too broadly. And I understand your concern about giving agencies some leeway so that they don't have to think through thousands of accommodations in their head and then find the narrowest one possible for every person. But that's not really the situation we're in with respect to this. There was an existing accommodation in place, and some employers had objections to that accommodation, the Little Sisters and some others. And even assuming that those objections needed to be taken into account, the rule sweeps far more broadly than that, and essentially scraps the existing accommodation, even for employers who have no religious objection to it. And so by definition, doesn't that mean that the rule has gone too far? No, Your Honor, for two reasons. First of all, the accommodation is available. It's not been scrapped. But secondly, including contraception as a seamless part of your insurance plan doesn't actually cost employers anything. So there's no reason why an employer who doesn't object to providing contraception as part of their plan, whether through the accommodation or otherwise, would invoke the exemption since they would be depriving their employees of a valuable benefit to which they do not object, and that doesn't cost them anything. But I would guess I would add... Do you have any evidence that the current only employers of the Little Sister kind who have complicity objections are now taking advantage of the exemption? I would think that there would be a lot of employers who would say, you know, we don't have those complicity beliefs, but now that you're giving us an option, sure, we'll take it. Your Honor, I would respectfully think that that would be irrational, given that employers would then be depriving their employees of a valuable benefit that doesn't cost them anything, because it doesn't cost any money to add contraceptive coverage to an insurance plan. It's a cost-neutral coverage provision. Why couldn't you just have written the rule to cover only those who have objections to the existing accommodation? In other words, those who have these complicity-based beliefs that the Little Sisters have? Well, because, Your Honor, I think here there's no reason to think anybody would do what you're suggesting, and the original burden stems from the contraceptive mandate itself. And so I guess what I would point to is cases like Ritchie against Stefano, which at the very least, if you don't accept my broader argument, give the government flexibility in the face of potentially competing statutory obligations. That's the case where the court said... Your Counsel, Justice Gorsuch? General, if you just continue, I'd like to hear the rest of your answer. Sure. I was focusing on Ritchie against Stefano, which I think gives the government flexibility when it's facing potentially competing obligations. That's the case where the court said that an employer could violate Title VII's disparate treatment provision if it had a substantial grounds for believing it would otherwise be violating Title VII's reconciled statutes that put parties in the place of having to decide whether to violate one at the expense of the other. And here, I think we, at the very least, have a strong basis for believing that the prior regime violated the Religious Freedom Restoration Act, and that gives us the discretion to adopt a traditional exemption, which, after all, is the way that the governments have accommodated religious beliefs. And I think that's particularly clear here, since, one, RIFRA both applies to and supersedes the ACA, and two, even if you don't think that the ACA authorizes exemptions, even though we think that it does, there's nothing in the ACA that prohibits exemptions. Thank you, General. Justice Kavanaugh? Thank you, Chief Justice. Good morning, General Francisco. Your colleague on the other side says the text and structure of the ACA make plain that Congress delegated HRSA authority to oversee guidelines defining what preventive services for women must be covered, not who must cover them. Can you respond to that argument? Yes, Your Honor. Respectfully, that is not what the ACA says. Section 13A.4 says that employers have to provide whatever coverage HRSA itself provides for and supports. Here, HRSA does not provide for and support coverage by the small number of employers with conscientious objections, but it does provide for and support coverage by everybody else. So I think our position follows plainly from the plain text of 13A.4 itself, whereas respectfully, I think my friend's position on the other side is irreconcilable with that statutory text. They're trying to put sentences into that text that simply do not exist. Thank you, General. Mr. Clement? Mr. Chief Justice, and may it please the Court, from the very beginning, the government recognized that its contraceptive mandate implicated deeply held religious beliefs, and so it exempted churches and some religious orders. And Congress recognized that the mandate was not some sort of categorical imperative that demanded universal compliance, and so it exempted tens of millions of employees under grandfathered claims. Thus, from the very beginning, the government's role was to exempt the Little Sisters from the mandate and its massive penalties as opposed to glaring RFRA problems. The federal government finally got the message and exempted the Little Sisters. That exemption remedied the RFRA violation and followed the best of our traditions. Nonetheless, the Third Circuit invalidated it by concluding that the regulatory accommodation satisfied RFRA and the government was powerless to go further. That decision is doubly flawed as the regulatory mechanism plainly violates RFRA, and RFRA does not impose a rule of parsimony or link the government to the least accommodating alternative. The Third Circuit's reasoning was plainly mistaken as to the substantial burden analysis, as its reasoning really cannot be squared with this Court's decision in Hobby Lobby. After all, the penalties that enforce the mandate here are the exact same penalties that underlie the basic contraceptive mandate in the Hobby Lobby decision itself, and so when the government imposes a burden on religion by telling the Little Sisters that they have to comply with the mandate or the accommodation or else, when the or else is massive penalties, that plainly provides a substantial burden on religious exercise. At the same time, the compelling interest analysis also works in favor of the Little Sisters for two basic reasons. First, the government has shown its ability to exempt churches and other religious orders from the very beginning, and then secondly, in the grandfather plan's exemption, the government has shown its ability to exempt tens of millions of only objects or are only exempted for reasons of administrative convenience. Mr. Clement, your client, the Little Sisters, do not object to their employees having coverage for contraceptive services, right? They don't have any objection if their employees receive those services from some other means. Their objection essentially is to having their plans hijacked and being forced to provide those services through their own plan and plan infrastructure. So if you had a situation where the certification was not necessary, in other words, the government finds out that the employees do not have contraceptive coverage through some other means and you do not have the hijacking problem that you refer to because the insurance cover would not to the employees, then why isn't that sort of accommodation sufficient? I didn't understand the problem at the time of Zubik and I'm not sure I understand it now. Well, I don't think we would have an objection to simply objecting to the government and then if the government has some way to provide the contraception services independently of us and our plans, we've never had an objection to that. But the government has insisted throughout this whole process that we not just be able to have an opt-out form and an objection form, but that same form serve as a permission slip to allow the government to track down TPAs and others to provide services through our plans. And that's always been the gravamen of our objection. It's never been an objection to objecting itself. Well, the problem is that neither side in this debate wants the accommodation to work. The one side doesn't want it to work because they want to say the mandate is required and the other side doesn't want it to work because they want to impose the mandate. Is it really the case that there is no way to resolve those differences? Mr. Chief Justice, in the wake of the Zubik remand order, there was a lot of back and forth between the religious objectors and the government. And I don't think that there really was a mechanism to find sort of some third way because the government has always insisted on seamless coverage, with seamless essentially being a synonym for through the Little Sisters plans. Thank you, Justice Thomas. Thank you, Chief Justice. Mr. Clement, I'd like you to have an opportunity to comment on the questionable standing of the states in this case, as well as the proliferation of national and nationwide injunctions, such as the one in this case. Certainly, Justice Thomas, I guess I would say one thing about each of those issues. At this juncture, as long as Massachusetts against EPA remains good law, we don't really have an objection to the state's standing. But I think their standing has to depend on that precedent. Because as General Francisco alluded to, throughout this litigation, they have not been able to identify even a single person who would lose coverage in such a way that would increase the burdens for the state and Pennsylvania and New Jersey. So the only way that they can have standing in this case is if they're excused from the requirement of being able to identify specific individuals who are harmed and increase their burdens. And I think there's a the absolute outer limit of standing, to be sure. With respect to the nationwide injunctions, that's an issue where I think that it's particularly inappropriate to have a nationwide injunction in a case like this. And the one thing we should have learned from years of litigation over the Affordable Care Act, and its contraceptive mandate in particular, is that the courts do not come to uniform decisions in this area. And sometimes the majority view in the circuit courts is rejected by this court. And so under those circumstances, in particular, for a single district court judge to think that he or she has a monopoly on the reasoning here and should impose a remedy that affects people across the nation seems to me to be very imprudent and not something that's consistent with equity practice, or really just sort of good practice and the way that our judicial system works, since it really depends on having the circuits potentially look at these issues independently, when they divide, this court takes review, and these nationwide injunctions short circuit all of that and put enormous pressure on this court, and it forces this court to hear cases and emergency postures. And Justice Ginsburg, that I would ask Mr. Clement, the same question I asked the government, at the end of the day, the government is throwing to the wind, the women's entitlement to seamless, no cost to them. It is requiring those women to pay for contraceptive services. If they can, first they would have to go search for a government plan. And if it turns out, as it will for many of them, that there is no other plan that covers them, then they're not covered. And the only way they can get these contraceptive services is to pay for them out of pocket, precisely what Congress did not want to happen in the Affordable Care Act. So this idea that the balance has to be all for the little sister type organizations, and not at all for the women, it just seems to me to rub it against what is our history of accommodation, of tolerance, of respect for divergent views. Well, Justice Ginsburg, I would say two things in response. First, I would echo what the Solicitor General said in pointing out that Congress did not even specify that contraceptions would be included in the preventative health mandate. And Congress went further and said with respect to grandfathered plans, that there were other mandates in the Affordable Care Act, like coverage for people up to age 26 and pre-existing conditions, that they were going to impose even on grandfathered plans, but they didn't impose the could be in the same position as employees of the Little Sisters of the Poor, even though there's no religious objection there whatsoever. And I think the clear teaching of RFRA is that when you're going to give those kinds of exceptions to people for secular reasons, then you need to give those kinds of exceptions to religious believers. Thank you, Justice Breyer. I have two reactions. One, of course, is that the point of the religious clauses is to try to work out accommodations because they can be some of the most difficult to resolve disputes and they can substitute a kind of hostility for harmony. So from that point of view, I really repeat, if there's anything you want to add, the Chief Justice's question, I don't understand why this can't be worked out. But if it can't, from what's been said so far, it seems to me the proper legal box to work it out in is whether this particular rule is arbitrary, capricious, or an abuse of discretion. After all, the religious groups say they have a real basis in objection. And the other say, look, these are women who will be hurt, who have no religious objection. And moreover, the insurance companies will be hurt because it will raise costs. And moreover, the taxpayers who pay for it will be hurt. Now, you have interests on both sides. The question is whether this is a reasonable effort to accommodate. And that, I think, is arbitrary, capricious, abuse of discretion. But that is the one thing that isn't argued before us in these briefs or in this appeal. So what do I do? Justice Breyer, I think you're absolutely right that that is not the nature of the objection that's been raised by the other side. They haven't said, for example, yes, this exemption might be okay if it were limited to the little sisters and others who object to the accommodation, but they went too far. That is not the nature of the challenge. They haven't brought that kind of substantive APA challenge. So I think what you would do is you would reject the challenge that is before you, because I don't think any of the grounds that have been litigated before you are valid. And you can make clear in your opinion that if somebody down the road has an objection to the scope of the exemption, say they work for a for-profit company, and with respect to that for-profit company, they're not getting their APA because the rule here is too broad. That would be a separate APA challenge that I don't think rejecting the challenge here would foreclose. So I think that's the path forward. Thank you, counsel. Justice Alito? Mr. Corman, I certainly agree with my colleagues that our best tradition in this area is to accommodate diverse religious views. So I want to ask you about the interests that are involved here. On the one hand, what would the little sisters feel compelled to do if they lose this case and they are told, you must provide this coverage through your plan? And on the other side, I want to ask you, since this has now been going on for some period of time, whether you have identified the number of women who work for the little sisters who want contraceptives but they can't get them through their employer's plan or through the insurance plan of a family member or a government program and can't easily afford to purchase them on their own? So, Justice Alito, on both questions, first, the little sisters believe that complying with this mandate is simply inconsistent with their faith. And so if this burden is imposed on them, they will have to reconfigure their operations. One of the anomalies here is that the government from the beginning has exempted religious orders, but they refuse, if they stick to their knitting and do only religious services. But if, on the other hand, they do what the little sisters do, which is go out and provide care for the elderly, poor, and for the sick, then they don't qualify for the exemption. And so maybe the little sisters will have to reconfigure their operations, but there's just nothing that they can do that will allow them to come into compliance with the government's mandate. And I think that's what Congress had in mind with Ripper, because they understood that when people are faced with a government obligation that their religion absolutely forbids them to comply with, that's something that the government should try to avoid at all costs. To answer the second part of your question just quickly, the little sisters have means is two things. One, no one will lose their coverage that they have now if the little sisters are given this exemption. And two, throughout that process, we have not heard of even a single employee who views this as a problem, presumably because many of these employees, even if they're not Catholic, because the little sisters hires on a non-discriminatory basis, but they've come to work for the little sisters understanding the mission of the little sisters, and I don't think they would really want to put the little sisters in the position that you alluded to of maybe having to stop serving the elderly poor. Thank you, counsel. Justice Sotomayor. Mr. Komen, assume that the government tomorrow passes a law that says every insurance company must reimburse every policyholder they have for COVID-19 vaccines. They say nothing about whether it's in their policy or not. If someone has a religious objection, they say they can be exempted from it. But you, insurance carrier, must pay for anyone who submits, who has a policy with you, for anyone who submits for a COVID-19 vaccine. Can the employer object to pay to that policy? So, Justice Sotomayor, I think the answer is no, and if I'd like to explain kind of how I worked through that. Mr. Komen, exactly the same rules that apply here to contraceptives, meaning all they have to do is tell the government that they object to vaccines, and by the way, we both know there are religious objectors who object to vaccines, and that they don't want their plans to be complicit in providing vaccines. So, Justice Sotomayor, I wanted to elaborate on my answer and kind of explain, you know, how the HICO is a little bit different from the way things work. As I understood the HICO, the government obligation was imposed directly on the insurers, so I don't think the employers could object at all. Now, I think an insurer that had a sincere religious objection to providing the coverage, say like the Christian brothers, they might be able to object. I don't think they actually have that objection, to be clear, but they could, in theory, if they objected to providing compensation for that coverage, they could object, and I think it probably would be a substantial burden in the context of COVID-19. I think that you might strike, the government might be able to carry its burden under strict scrutiny, but I think that would be the way to think through that hypothetical. Thank you, Counsel. Justice Kagan? Good morning, Mr. Komen. I'd like to start by asking you about a response that you gave to Chief Justice, because you said there that you had no objection to objecting, the Little Sisters didn't, and I've taken that to be your consistent position throughout the litigation, but what if an employer did have an objection to objecting? In other words, had an even more, say, extended view of complicity, so that he thought that, the employer thought that extending itself made him complicit, because it led to a chain reaction, whereby the employees were eventually going to get coverage. What would you say about that? Justice Kagan, I think it would depend on additional factors, like whether the government enforced its requirement of an objection with the same massive penalties we have here. If they did, then I think the way to think about that particular objection would be that if that objection is forbidden by the person's religious beliefs, sincerely held, and the government enforces with a massive penalty, then there is a substantial burden, and then the analysis would shift to the compelling interest, least restrictive alternatives test. In most cases, I think the government would submit or sustain its requirement of at least having an objection. The irony is, this might be the one context where they can't, because they've never required the churches, the religious auxiliaries, the other orders that stick to their knitting and engage in only religious activities. They've never had to even object. They're just saying, Even in that case, where objecting to objecting is the only thing that you would think that the government would do. You have to make all the same arguments, right? Women can get contraceptive coverage elsewhere, and there are other exemptions to this scheme, so the employer would prevail, even if it were only objecting to objecting. I think that's right, Justice Kagan, but just to be clear, I think that has to do with the way that the government has operated this whole program. Since they've never required the churches or the other religious orders or the grandfathered plans to object, I think that puts the government in a difficult position in this hypothetical situation. My colleagues have never made that objection. Justice Gorsuch? Mr. Clement, a major feature of the opinion below and the arguments in the briefs, at least, was that the government had failed to comply with the procedural requirements of the APA, and I didn't want that major component of the case to go unaddressed today. I want to give you a chance to respond to that. Thank you, Justice Gorsuch. I think on the APA, there are a number of different ways to come out differently from the way that the Third Circuit analyzed this issue. We obviously think the Third Circuit erred. In some ways, the most straightforward way is to just find that the good cause standard or exception for the original IFR here was satisfied, and we think that the good cause standard here was satisfied for the same reasons that the government had good cause, for example, to make immediately effective moderations in light of this court's order in the Wheaton College case. We think that, likewise, my friends on the other side say there was good cause for the original exemptions and the like and the mandate because they needed to make changes quickly for the upcoming plan years. And we think all of those same things apply here. And then, of course, another way to rule against the Third Circuit on that issue is to recognize that there's specific statutory authority here to promulgate IFRs for benefit plans, which probably recognizes the fact that these benefit plans will often have to be changed in ways that will affect future plan years, and so changes need to be made very quickly. But the third way, of course, to reject the reasoning of the Third Circuit is to say even if there was some sort of original sin in the promulgation of the IFRs, it was cured by the notice and comment that actually took place subsequently. And one feature of the Third Circuit opinion that I just want to draw attention to is the Third Circuit never faulted the government for responding to the thousands and thousands and thousands of comments it got in any kind of insufficient way. So the government, I think, on this record has complied with all of the textual requirements of the APA procedurally, and yet they've still been found to be out of compliance based on a textual test. Thank you. Justice Kavanaugh? Thank you, Mr. Chief Justice. Good morning, Mr. Clement. I want to follow up on Justice Kagan's question about the objection to objecting. I had thought that would be litigated, fought out under the least restrictive alternative prong of RFRA, and the government might be able to argue that there's no less restrictive alternative available in that situation. You might disagree and try to identify a less restrictive alternative, but I had thought that's where it would be I think, Justice Kavanaugh, that's exactly where it would be litigated, and I think why I'm, again, we're talking about a hypothetical that doesn't arise from my clients, but I think where I might come up differently from you on the least restrictive alternatives analysis is to point to the fact that the church exemption and the grandfather plans exemption have always worked quite well without requiring there to be any kind of formal objection registered. And so it does seem to me that those are essentially other ways that the government has been able to comply. And then I guess the other question, of course, is if we're in the realm where the government itself has, through something like the final rule, alleviated the obligation even to have an objection, I'm not even sure this question we're talking about would arise. Right, no, I understand that, and that's what I expected your argument to be in that context. Second question, just to on the arbitrary and capricious test, the exercise of discretion must be reasonable. What are the limits that you would identify to the government's discretion, if any? So I would identify all of the limits that General Francisco alluded to, and one more. One thing I think is a little bit artificial here about the position of the other side, is they want you to look at the ACA and RFRA as if they're siloed and they don't interface. But of course they do, and there's an obligation on HRSA to take into account RFRA as well as this authority under the ACA. And so it seems to me that an exemption for religion of the kind that's in the final rule here, I think is going to be insulated from an arbitrary and capricious challenge in a way that exempting, say, just large employers or employers incorporated in Delaware, I think all of those would be irrational and arbitrary and capricious under the ACA. But here, the agency has complied with RFRA consistent with its authority under the ACA, which seems to give it a particularly strong case for its actions here to not have been arbitrary and capricious. Thank you, counsel. Mr. Fisher? Mr. Chief Justice, and may it please the court. The moral and religious exemption rules rest on three sweeping assertions of agency authority. First, the agency's twisted narrow delegation that allows the Health Resources and Services Administration to decide which preventive services insurers must cover under the Women's Health Amendment into a grant of authority so broad it allows them to prevent virtually any employer or college to opt out of providing contraceptive coverage entirely, including for reasons as amorphous as vaguely defined moral beliefs. Second, the agency's claim that RFRA, a statute that limits government action, affirmatively authorizes them to permit employers to deny women their rights to contraceptive coverage even in the absence of a RFRA violation in the first place. As many of the questions have reflected, the prior rules struck a balance that permitted objecting employers to opt out but still allow their female employees to receive contraceptive coverage. These rules, however, exempt such employers altogether, even if they had no objection to this prior accommodation. And these rules also allow for the first time publicly traded companies to claim the same exemption despite the agency's admission that no such ever requested one. And third, the agency's claim they were justified in issuing these sweeping new rules without first putting out a proposal and seeking comment as the APA requires. They advance an interpretation of the APA that is inconsistent with its text and purpose and that would effectively write the requirement of pre-promulgation notice and comment out of the statute. Now, in addition, the agency is also challenged to challenge the scope of the federal court simply lack the authority to invalidate unlawful agency regulations in their entirety. In isolation, the agency's arguments are incorrect. But taken together, stretching a narrow delegation well beyond its limits, finding broad affirmative rulemaking authority in a statute that doesn't provide it, bypassing prior notice and comment where the APA requires it, and seeking to vastly curtail the court's authority to invalidate unlawful agency action. Taken together, these arguments make apparent that what this case is about is not the resolution of a long-running dispute, but rather the assertion of vast agency authority at the expense of Congress and the courts. Thank you, counsel. I have a question that was hypothetical in one of the amicus briefs that I thought was pretty good and I haven't heard an answer to yet. And that's, say you have a couple going out to dinner and they tell the babysitter, well, the children have to do chores, you know, you decide which ones. I think everybody would agree that that includes the authority to say not only that we have to do the dishes and sweep the floors, but Tommy, you do the dishes and Sally, you sweep the floors. And not the assumption that each child would have to do each chore. And here your argument about the APA statute is that it gives HHS the authority to specify which services have to be provided, but does not give them the authority to make determinations about who has to provide which, but instead imply that every Mr. Chief Justice, our answer is that that is the only reasonable reading of the text of the Women's Health Amendment. The who must provide is answered by the beginning of 13A. It says, a group health plan and health insurance issuer offering individual health insurance coverage shall at a minimum provide coverage for and shall not impose any cost-sharing requirements for. Now, shall is mandatory, as this court recently acknowledged again in the cost-sharing case recently dealing with the ACA. Below that language there are four separate categories of services to be covered. Nobody disputes that the first three are mandatory, that all covered insurers must cover the first three. The only dispute comes in the fourth one, which is with respect to women, such additional preventive care as provided for in comprehensive guidelines. And in the hypothetical that Your Honor referred to, which I believe is in the Texas amicus brief, they modified the language of this requirement by taking out the such additional language. That language is key because it answers the question of what services are insurers to provide. Well, with respect to women, it is such additional preventive care and screenings as provided for comprehensive guidelines. So, as provided for clearly modifies such additional care and screenings. It doesn't go beyond that. Thank you, counsel. Justice Thomas? General, just a brief question that's a little different. I'm interested in your view on standing and with your argument for standing in this case that challenged the regulation, the government's regulation that might impact your costs, the state's costs, seems to suggest that any time there is a rule change at the federal level that affects you, you would have standing. And then that, again, following this case to its remedy of a nationwide injunction would suggest that in these sorts of cases, a nationwide injunction would be appropriate. I'd like you to comment on that. It seems to be somewhat problematic and to suggest that there's a problem with both standing and nationwide injunctions if they are this easy to get. Thank you, Your Honor. And to be clear, we have to satisfy standing requirements just as any other litigant has to show standing. And we did in this case by showing that the rules would impose costs on Pennsylvania and New Jersey. And that is in some ways sort of the most basic type of injury that all parties, not just states, allege in showing harm. Now, my friend on the other side referred to Massachusetts versus EPA, which certainly recognizes that states have a special place in our constitutional order. However, we still demonstrated that based on the government's estimates of the number of women affected, these rules would impose direct costs on us. And with respect to the question about nationwide injunctions, first of all, I want to stress that we're here in a preliminary posture. We were granted a preliminary injunction. We've moved for summary judgment. The government requested that the case be stated, the district court granted that. We could have the case wrapped up now. The analysis with respect to nationwide injunctions is different, we submit, in the context of an APA challenge, where the ultimate remedy available is that the court shall set aside a rule that is invalid. If courts sort of were able to slice and dice rules and say, well, the agency, you can enforce it as to this person, but it stays in effect as to everybody else, the result really would be regulatory chaos. So where a challenge is brought under the APA to a regulation, taking account of that final remedy that's available, granting preliminary relief on a nationwide basis is appropriate. It was also appropriate here because the district court found in a very thorough, very well-reasoned discussion that acknowledged your honor's concerns as expressed about nationwide injunctions, discussed this idea that there are significant cross-border harms here that simply couldn't be addressed in a more narrow injunction. Thank you. It would seem though that ultimately you could get, if that's the argument, nationwide injunctions with virtually any regulatory change. I don't believe that's the case, your honor. I would think that there are many regulations that are not going to impose costs on the states directly or indirectly. And certainly in a nationwide injunction context, I think it would still depend on the specifics of the rule being challenged and the nature of the harm that the challengers are alleging. And as I again indicated, the district court really took account of all these concerns, talked about the need for percolation among the circuit courts and acknowledge frankly, in plain terms, that fashioning preliminary relief is an imperfect science that district courts try their best and they're reviewed for the abuse of discretion standard. I think that is what you are. But one, I do want to get in one question about when the APA was adopted, do you think there were such things as nationwide injunctions or were they handled on a case by case basis? Your honor, I believe there is a history certainly of relief going to beyond the parties to a case. Whether they were classified nationwide injunctions is difficult to say. And I think this is dealt with very well by the various amicus briefs. But I also think that in passing the APA, Congress provided a very specific remedy. And as your honor stated in the travel ban case, authority for nationwide injunction has to come from either the constitution or statute. Well, the APA here is the authority that we would allege, we argue that the basis for this injunction comes from. It says as a final remedy, court shall set aside improper agency action. And then it permits agencies or permits courts to stay agency action as this court did a few years ago in the clean power plan case. It permits them to enter injunctions, it permits them to postpone the effective date. And many of those remedies suggest relief going to the rule in its entirety. So I think you'll hear the text. Justice Ginsburg? Let's see. So I just remain troubled by the complete abandonment of the Congress' interest in saving women's costs. This is going to force costs on the women that Congress wanted to provide free coverage for. I've never seen any of our prior decisions suggest that those interests could be thrown to the wind, and the women could be left to their own resources to cover themselves to get policies that would cover them for these contraceptive services as a premium to them. Your Honor, that is absolutely correct. And I think it's important to remember just how broad these rules are. First of all, there are two rules that we're dealing with. One that we haven't talked about as much as the moral rule that simply says an employer with a moral objection to providing contraception can be completely exempted. The district court noted this could in theory allow an employer that objects to women in the workforce, for instance, to remove itself from providing contraception. And with respect to the religious exemption, there are certain key features that really show how broad this is. First of all, it eliminates the accommodation as a mandatory requirement. So even for, for instance, all the various plaintiffs in the Hobby Lobby cases that this court recognized were perfectly fine with the accommodation, they are now exempt. And I disagree with my friend's conclusion that they're unlikely to object to contraception. They made that clear. They were simply fine with complying with the accommodation. So I think it's likely that many of them will, in fact, opt out. In addition, as I mentioned, this applies to publicly traded. Where would the moral exemption come from? It does not, they do not rely on RFRA for the moral exemption. They claim authority under 300 and as we've argued and as courts both found, that statute simply doesn't support the conclusion that they can create whatever exceptions they want. If their reading were correct, there would be no limits to what HRSA could do other than arbitrary and capricious review. HRSA could decide to eliminate the no cost sharing requirement. It could decide that, you know, certain services really don't need to be covered at all, even if they're in, you know, even if widely recognized as preventive services, it could exempt whole classes of employers for reasons having nothing to do with the reasons here. So our reading, we submit as a far better one. And frankly, we have to remember, we're talking about the health resources and services administration. It's really unlikely that Congress would have delegated to that organization authority to create broad religious and moral exemptions, given that they have no expertise in that area. Justice Breyer? Two related questions. Thank you. One is, as you know, the statute says that they have to provide additional preventive care as provided for in comprehensive guidelines supported by the health resources and services administration. Well, read that and you get at least some ambiguity. So my question is really, given your arguments, and given what may well be ambiguity, at least in the statute, why didn't you make the argument, it's arbitrary, capricious abuse of discretion, you're saying it's too broad, you're saying that it'll hurt women, you know, you point out that it'll raise health care costs, and a whole lot of things. And the government has things to reply to that. But why isn't that the proper legal box? That's my first, my related question is, if you were to let a district court get at that issue, that district judge might try to reach an accommodation by saying, have you read, which you have the brief of Phyllis Boorzy and Daniel McGuire. And it points out that the prior rule didn't pirate, did not pirate the health plan of little sisters. And if they think it did, and you think it didn't, well, my goodness, it shouldn't be able to monkey with it in some way. So everybody reluctantly agrees that it's okay. All right. Now, those advantages I see of going back and making a different kind of argument, put all your arguments in a different legal box. So why not? Your Honor, I don't disagree with any of that. I do think the rules are additionally arbitrary and capricious. And we did raise that argument in our complaint. We also argued, I think, correctly that they see that the statutory authority cited by the agency did not support the rules. And since we want on that basis, there was no need to go any further and say, well, if they had the authority, did they exercise it correctly? I disagree also with your Honor's suggestion that the language is ambiguous. I think as we explained, the use of the word supported in context reflects similar language in paragraph three, immediately proceeding. And all that refers to is the fact that the guidelines in paragraph three, which are the bright horizons guidelines were funded by HRSA, but actually conducted or produced by American Academy of Pediatrics. So HRSA supports those guidelines by contracting, by funding. And I think Congress borrowed that language. And the as provided for, as I indicated, refers back to such additional preventive care and screenings. So we don't think there's an argument as to ambiguity. Now, as to whether there could be a resolution, I certainly would hope that there is. As the Boards McGuire brief explains, the government, the prior administration, we do not believe that these plans are being hijacked. And to be clear, we brought this suit against the federal government. We have not challenged the Little Sisters. We have not challenged their Colorado injunction. They and all the other parties to Zubik are protected by injunctions and do not have to comply with the contraceptive mandate, no matter what happens in this case. But could there be a resolution to the narrow set of cases out there? I would hope so. But the fact that there was this ongoing dispute doesn't justify jettisoning the accommodation for everyone else. Bringing in publicly traded companies certainly doesn't justify the moral rule. And those, I think, are the most egregious examples of simply how overbroad these two regulations are. Thank you. Thank you very much. Justice Alito? Well, Mr. Fisher, you say that the Affordable Care Act does not allow the government to make any exceptions to the contraceptive mandate to accommodate religious objections. Now, if that's true, the original exemption for churches, their auxiliaries, and conventions of churches, which was established by the prior administration, violated the Affordable Care Act. Would you come back and say, that was required to comply with a First Amendment church autonomy doctrine? And what I'd like you to explain is your understanding of the scope of that doctrine. And let's take as an example, a woman who works for a church in an entirely secular capacity, let's say a woman who cleans church property. Under your understanding of this religious autonomy doctrine, does that mean that that employment relationship is entirely off-limits for any federal regulation, for example, or any state regulation? For example, from Title VII's Prohibition of Discrimination on the Basis of Race, Age Discrimination and Employment Act, Americans with Disabilities Act, Equal Pay Act, Fair Labor Standards Act? Your Honor, we would not agree with that conclusion, that individuals in entirely secular positions are exempt from all those requirements under the church autonomy doctrine. What we have argued is- I'm sorry to interrupt you, but you do say that it would violate the First Amendment to require the church to provide contraceptive coverage for that woman. Your Honor, what we are arguing is that there is a basis in the First Amendment for exempting churches in some way, that certainly there is a core of church autonomy that agencies in implementing federal law must protect. Well, in some way, as to the provision of insurance coverage for contraceptives, I took your argument to mean the First Amendment would prohibit the government from requiring a church to provide that. Am I wrong? Certainly. As to ministers, certainly. Pardon me? As to ministers, certainly. That is correct, but I would add, we are not arguing necessarily that the prior administration got everything right in the details. There have been arguments on both sides that perhaps the church exemption- Mr. Fisher, I'm not talking about the details. I'm talking about a secular employee of a church from receiving the contraceptive coverage. Your argument has to be that's required by the First Amendment, or you have to say, maybe this is your position, that the original church exemption is contrary to the Affordable Care Act. That is not our position. We think that the original church exemption was supported by the First Amendment. We don't agree it was supported by the Affordable Care Act. We think the prior administration was wrong. I really would appreciate your answering my question. If the First Amendment requires an exemption for provision of contraceptive coverage, why would it not also require an exemption for all of the other regulations that I mentioned? Certainly, in the core ministerial functions, it does. We don't dispute that. I think the question is whether- I'm not talking about a minister. I'm talking about a woman who cleans the church. Exactly. And our position there is, I don't think it's necessarily the case that the First Amendment required that the church exemption be as broad as it was. However, given the realities of insurance and the need for ERISA plans to be consistent, the prior administration may have made a decision that they were going to apply to all employees of churches. We don't take issue with that, even if that went a little bit broader than what the First Amendment requires, which is protecting individuals in ministerial functions and the church's autonomy with respect to those individuals. That's a far cry from what they did in these rules, which goes well beyond the core of the protection that the First Amendment requires or that ERISA requires. If I could ask one other question. Explain to me why the Third Circuit's analysis of the question of substantial burden is not squarely inconsistent with our reasoning in Hobby Lobby? If a person sincerely believes that it is immoral to perform an act that has the effect of enabling another person to commit an immoral act, a federal court does not have the right to say that this That's precisely the situation here. Reading the Third Circuit's discussion of the substantial burden question, I wondered whether they had read that part of the Hobby Lobby decision. So in Hobby Lobby, the question was essentially the degree of attenuation between providing coverage and utilizing the contraceptive care, and the court rightly concluded that the fact that others were involved didn't really matter. Here the court said essentially that where an objection depends on the operation of the law, and here it is the legal requirements that are shifting the burden to the insurer or the third party administrator. Courts still have a duty to inquire as to what the law actually requires of the objector, and the nature of the objection was that filling out this form made them complicit in providing contraception. They did not object to the idea of filling out a form stating their objection by itself. They objected to what flowed from the form, and the Third Circuit, consistent with the seven other circuits that reached the same conclusion prior to Zubik, concluded that in that situation a court can look at what's actually being required of the objector, and this finds support in the Bowen v. Roy case, where not the daughter's social security number, which was the nature of the objection. Eighth Justice has still said that, you know, essentially that does not raise a recognizable First Amendment claim. You're arguing that the Little Sisters didn't understand what the law required them to do, or didn't understand the significance of what the law required them to do? Not at all. We are simply arguing that they have not sufficiently... They didn't understand what the law required them to do? No, we're not saying that at all. We are saying that the harm they've alleged is not a legally cognizable substantial burden. The courts do not... Their understanding of moral complicity is wrong. No, we're not saying that at all. We do not challenge their view of moral complicity. What we do challenge is whether that what they are saying rises to the level of a substantial burden, which is ultimately a legal test, and Congress included the word substantial for a recognized that not every law that had an effect on religion necessarily should be subject to strict scrutiny. Thank you, Counsel. Justice Sotomayor? Counsel, going back to the Chief Justice's example a second, clearly we understand that there's inherent power to share the chores between the two children, correct? However... Yes, I think... If the babysitter decides, I just disagree with the mom, I'm not going to have either of them do anything. Would that be contrary to the instructions that the law gave? That certainly would be, Your Honor. I would agree with that. Well, let's talk about this situation. Here, the government's exemption is not merely saying to the little sisters, you don't have to provide coverage, whether it's you or a church or anyone else, but we're not going to... We're also saying that your insurance policies, independent actors who have a legal obligation to pay for the contraceptives that employees use, that they don't have to do it either. You're objecting to that second part of the exemption, aren't you? So that is correct as a general matter. I just want to make one specific point, which is that Your Honor mentioned the little sisters. Their insurance carrier stated that it will not provide contraception no matter what, or their health plan, and because it's a church plan exempt from ERISA, the government cannot enforce it. So even if they didn't have their separate injunction, their employees would not receive contraception. We're not trying to challenge that at all. We're not trying to require them to provide... That's an interesting point. I didn't know that. So the little sisters claim is actually moved here. Well, that is why we argued that they lacked appellate standing. They lacked appellate standing because they don't have to provide it, neither does their insurance carrier. Correct? That's correct, yes, and as a result of the injunction. That has nothing to do with this case. As I understood it, well, no, that has to do with the church exemption. Church plans do not have to provide, under the law, they're not ERISA plans, so they don't have to provide coverage in this situation, correct? So where the employer utilizes the accommodation, the government lacks the means of enforcing the requirements against church plans because they are exempt from ERISA. So if an employer utilizes the accommodation, the church plan can decide whether or not it wants to comply, and there's no penalty if the government, if it chooses not to comply. So tell me which part of the government's exemption you are actually challenging? So we think the government's claims of authority for the exemptions were incorrect, but we think that the most egregious parts of the rules are, first of all, the moral rule, which I think is important to stress that that's half of what's at issue in this case. The elimination of the accommodation as a mandatory requirement, including for companies that had no problem with it, the inclusion of publicly traded companies and large universities, and then two other points. One, to claim this exemption, companies do not have to provide any They can simply include the fact that contraception isn't covered in all the other ERISA notices that they mail out. They don't have to say specifically, we have this objection, we are not providing coverage. And in addition, they don't have to show any sort of substantial burden. They don't have to send anything to the government saying, we believe we're burdened for these reasons, we have these objections. So there's really no way to evaluate, for instance, whether a company is sincere in the nature of its objections. That is part of the RFRA analysis. And, you know, as the court acknowledged recently in Ocentro, RFRA creates a mechanism for courts to enforce it. We don't dispute that agencies should take RFRA into account. But ultimately, RFRA creates a judicial remedy and courts and agencies should be looking to guidance from the meaningful opportunity for judicial review of their decisions. Justice Sotomayor, proceed. I guess the question I have is the exemption as structured permits the insurance carriers not to provide coverage? Yes, there's no requirement that objecting entities utilize the accommodation. It's completely optional. So they can simply claim the exemption and tell their insurer don't provide contraception and no entity has an obligation to provide it at that point. Thank you, counsel. Justice Kagan. Good morning, Mr. Fisher. I'd like to ask you some questions about what many people would think of as the most boring part of your argument, which is APA notice and comment. I'm not quite sure I understand the argument. So let me just start by saying what you're doing is you're hypothesizing that there should be some significant difference between what happens and how a court reviews what happens when an agency works off of an interim final rule as opposed to when an agency works off a notice of proposed rulemaking. And I guess the question is why should there be any real difference between those two? Your Honor, I want to stress one aspect of our argument, which is that our argument hinges on whether the first rules, the 2017 rules, were themselves procedurally valid. If they were valid, then the 2018 rules are procedurally valid as well. Okay, so let me just make sure I understand that. Suppose that there were good cause for issuing an interim final rule. At that point, if the agency then says, well, that's nice, we had good cause for doing this because we had an emergency, but now we're going to notice and comment. At that point, would that be if there were no good cause rule at all? Your Honor, if the agency has good cause to issue the rule with immediate effect, then the provisions of Section 553 simply don't apply. I don't think that's right because a good cause can give you cause to act right now, but it doesn't give you cause to act for 20 years without notice and comment. So an agency could say we have good cause to act right now, but now we understand that we have to do a notice and comment proceeding because now, you know, there's something in place and we can take our time and do it. That's not true, Your Honor. I apologize. If the agency wishes to modify the rule or take further comment, then yes, it can go through the 553 process if the good cause that prompted the but in many cases, it has to. The good cause doesn't last forever. So in that kind of case, do you think that the standard is heightened when a court looks at this and says that they do notice and comment correctly? No, Your Honor. In that case, the standard would be the same as it would be in any other APA case. Okay, because I thought that your reasons for why the standard should be heightened was when the interim rule was valid. Because as I understand your reasons for thinking that the standard should be heightened, that the agency has kind of gotten psychologically used to the rule and may be less willing to make departures from it. But that applies even when the good cause rule is valid, doesn't it? It does, and I think that reflects a balance that Congress struck, recognizing that in most cases, prior notice and comment is the most effective means of getting to a more informed decision. In some cases, that interest is trumped by the need for an immediately effective rule. So the benefits of notice and comment have to sort of give way a little bit so that the agency could act quickly. But here, where we believe the good cause standard wasn't satisfied, the APA plainly requires the agency to comment on a proposal. Okay, so I'm right in saying that this really does depend on whether the good cause requirement was satisfied in the first place. Yes, absolutely. Okay, and then as a remedy, you say we should just go back to the original rule, but the original rule was done in the exact same procedural manner. So how would that make anybody any happier? So there are a number of rules that have been implemented dealing with this. A number of them went through full notice and comment. In one case, there was an advance notice of prior rulemaking of proposed rulemaking and NPRM. In two cases since the women's health guidelines were issued and one time before, the prior administration did immediately go to an immediately effective rule. They argued good cause. In one instance, the D.C. Circuit upheld that finding. In another instance, it was never, as far as we know, ruled on by any court. We think the arguments made were much stronger in those cases, and regardless to be litigating this question nine years after the fact, simply doesn't make a lot of sense. What we're saying is that the good cause claims made here by these agencies and these rules have to be evaluated on their own, and if what the agency has said here satisfies good cause, then agencies could always find good cause, and the result would be, and I think this is the most important part of our argument, if what the agencies did here is okay, every agency could say we're just going to issue a rule, make it effective immediately, claim good cause, and then take comment, and even if they lose on the good cause finding, they don't have to worry for long because as soon as they've taken comment and issued a new rule, then the rule will be immediately effective, and it will be as if there was no violation in the first place, and it's reasonable to think that agencies will take their cues and will say, okay, well, we're going to take the risk, and we're going to do that because, frankly, there really isn't much of a risk in the end if everything will be fine once they've taken comment and issued a new final rule. Thank you, counsel. Thank you, your honor. Justice Gorsuch. Good morning, counsel. I'd like to turn back to where Justice Breyer left off on the substantive challenge, and I suppose that the argument on the other side goes something like one could understand an arbitrary and capricious argument about the overbreadth, arguable overbreadth of these exemptions, but the challenge before us is whether the agencies exceeded its statutory authority, and looking at the statute here, it's about as excessive a delegation of statutory authority, or not excessive, expansive a delegation of statutory authority as one might imagine. It talks about the comprehensive regulations, and when an agency is given that kind of leeway, we normally think of comprehensive to include limitations, conditions, exceptions, as well as a general rule because there's no rule that doesn't have an exception, and then we look at the original accommodation, and at least some suggest that that original accommodation to churches was consistent with that statutory delegation, and then you throw RFRA in the mix, and that's normally thought to trump any and inform any other existing statutory obligation. So what do we do about that? I think that's what Justice Breyer is trying to get at, and I guess I'm curious for a little further thought on it. So yes, your honor, I think if the delegation is read the way the agencies would like to read it, then it is remarkably broad, and I think would frankly raise non-delegation problems. I think the delegation is cabined by the fact that two things. First of all, I think the structure of the section makes clear that items 1, 2, 3, 4 are all simply categories of services, even though identifying those services refers to comprehensive guidelines. What begins that paragraph 4 is, with respect to women, such additional preventive care and screenings, and then the second point is that to the extent there might be... I'm sorry to interrupt there, but I just want to understand how you read that, because I've heard that a few times, that such additional preventive care and screenings, but then dot, dot, dot, as provided for in these comprehensive guidelines. Can you explain how those two interact, I guess? Yes, so such, which typically means, you know, in the manner to be indicated, refers or sort of sets the stage for as provided for. So, if you're asking the question, well, what additional preventive care and screenings must be provided, the answer is such, so in the manner to be provided, as provided for in the comprehensive guidelines. So, all of that is answering the question of what additional preventive care and screenings are to be provided. If you read, as provided for, sort of applying to the entire section, sort of going back into subsection A and modifying those requirements, then you're sort of unmooring it from the way it's used in paragraph 4 and leaving such additional preventive care and screenings without any further explanation. And in addition, I think the other three categories provide some guidance, and I think reasonably tab in the agency's authority. The other three paragraphs all refer to guidelines that already existed. So, HRSA had the ability to look to those, and those are all, you know, there are no religious exemptions in those guidelines. There are no broad exemptions. They're simply lists of services, lists of vaccinations that are required, other things. So, where Congress lists several items, I think it's reasonable to conclude that Congress envisions that the agencies will operate or will exercise their discretion sort of in a similar manner in each instance, and I think that's what was assumed here. But it is not part of that assumption. I think the argument is, hey, we can't specify which preventative care and screenings will be provided or under what conditions, and any provision of care is necessarily going to be conditioned and subject to all sorts of exceptions. That's just the way the world works. There's no rule without an exception. And toward that end, again, just drawing your attention back to the accommodation for churches, many people have argued, and certainly the prior administration did, that that was consistent with the statute, not something imposed upon it from outside by the First Amendment. What do you say about that? Your Honor, so we disagree with the prior administration's conclusion that the section authorized the prior church exemption. Let's suppose, though, that that was correct, and I understand that's not your position. What would follow from that for this case? So, if that were correct, then the agencies would have some discretion to create evaluate these rules under arbitrary and capricious review. And I think there are several problems with them, but we would not be in a world where the question of the agency's authority in the abstract was at issue. Okay. And if I could turn quickly to one other point entirely, the substantial burden argument that Justice Alito raised. And I understand your position. I thought that there would be no substantial burden imposed by a requirement that they pay for contraceptive care. Is that correct? No, Your Honor, not at all. I mean, if an employer objected to that requirement, there would certainly be a substantial burden. Okay. All right. I misunderstood that colloquy then. Thank you very much. Thank you, Your Honor. Justice Kavanaugh. Thank you, Chief Justice, and good morning, Mr. Fisher. I'm wondering your reaction to this way to think about the case, maybe picking up on Justice Breyer's question and Justice Gorsuch's first question. As a number of my colleagues have pointed out, Justices Ginsburg, Sotomayor, Alito, Breyer, and others, there are very strong interests on both sides here, which is what makes the case difficult, obviously. There's religious liberty for the Little Sisters of the Poor and others. There's the interest in ensuring women's access to health care and preventive services, which is also a critical interest. So the question becomes, who decides? Who decides how to balance those interests? And the answer, of course, is Congress in the first instance. And RFRA provides a backstop on that. But even beyond RFRA and the ACA, Congress is delegated to the agency. Okay. So we have a delegation from Congress to the agency, which is common. And sometimes Congress delegates narrowly with narrow language, and sometimes it delegates broadly. And the rule of thumb I've always thought is courts should construe narrow language narrowly and broad language broadly. And this seems to be broad language, as Justice Thomas noted. When you have that kind of broad language, you're going to get different executive branches who are going to exercise their discretion within that broad language and balance the interests differently. And then the question is, what's the judicial role? And it seems to me the judicial role is not to put limits on the agency discretion that Congress has not put there. And then we're left, I think as Justice Breyer said, and I want to get your test at the end of the day, in just making sure that in exercising its discretion and balancing those interests, the agency didn't go outside the limits of reasonableness, which is a very deferential test. It's not abdication, but it's deferential. Why isn't that the way to look at the case? And if we get down to the bottom line of, is this reasonable, not maybe everyone's choice, but at least within the bounds of reasonable, why isn't this a reasonable way to balance it? So just get your reaction to all that. Thank you, Your Honor. So on that last point, the reason this is not a reasonable way of balancing is that the rules go well beyond what RFRA even arguably would require. As we mentioned, for instance, companies that have no objection to accommodation are now wholly exempt. And however you interpret the Women's Health Amendment, and we strenuously believe that it implies a mandatory duty on insurers to provide this coverage, but certainly it would defeat the purpose of that amendment to say that women should not receive coverage if they work for an employer that objects to contraception generally, but was willing to participate in the accommodation process or to note its objections so that they could still receive coverage. We also think there's that the exemption for publicly traded companies in the absence of any evidence that any publicly traded companies requested one goes well beyond. We think the moral rule is so untethered from any reasonable standard that it's certainly arbitrary and capricious. And we also think that if we're in the RFRA world, that the way this exemption, the way these exemptions are structured would really defeat any opportunity for scrutiny as to whether an employer claiming an objection has a sincere religious belief, whether it is substantially burdened, and would essentially remove the courts from the process entirely. And I think one point to remember is we are dealing with the interplay between two statutes. And as the court acknowledged in Epic Systems v. Lewis, ultimately deciding how two statutes work together and where the boundaries are is a question for courts that can't be left just to the agencies. And we submit the Women's Health Amendment to impose a mandatory obligation that shall at a minimum provide coverage for and shall not impose any cost sharing requirements for. And nevertheless, what is clear from the floor debate on that is that Congress envisioned that it would require coverage for preventive services, that family planning would be included. Now, you also have extremely important interests in RFRA and in the nature of the religious objections that are being claimed. Ultimately, courts need to resolve these questions. And the agencies have essentially taken these decisions out of the realm of the judiciary and decided for themselves. And that simply isn't how RFRA works. And under Epic, it's not how these questions should be addressed. Thank you very much, Mr. Fischer. Thank you, counsel. General Francisco, you have a minute for rebuttal. Thank you, Mr. Chief Justice. Although RFRA both authorizes and requires these exemptions, at the very least, they're justified under Section 13a.4. That, after all, was the very basis for the church exemption back in 2011. It's also the respect to the colloquy between my friend and Justice Sotomayor. And if you accept respondents' interpretation of the accommodation, it's also the basis for the accommodation itself. Under my friend's position, they seem to concede that all of these other provisions violate Section 13a.4. After all, the church exemption is not limited to ministers, and the church exemption applies to churches that don't even object to contraception. But regardless of how you resolve the issue, the rules here bring a decade-long dispute to a durable end, and they should be upheld. Thank you, General. The case is submitted.